# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

| | |
|---|---|
| MAPLETON PROCESSING, INC., | |
| Plaintiff, | No. C12-4083-LTS |
| vs. | *MEMORANDUM OPINION AND ORDER* |
| SOCIETY INSURANCE COMPANY, | |
| Defendant. | |

---

## TABLE OF CONTENTS

INTRODUCTION ........................................................................... 2

PROCEDURAL HISTORY ............................................................ 2

FACTUAL OVERVIEW ................................................................ 3

ANALYSIS ..................................................................................... 9
    I.    *Society's Motion for Summary Judgment* ..................................... 9
    A.    **Summary Judgment Standards** ......................................... 9
    B.    *Discussion* ................................................................ 11
        1.    *Lack of a Pre-Action Examination Under Oath* ........... 12
            a.    *The Watson Decision.* ................................. 12
            b.    *Does Watson Entitle Society To Summary Judgment?* ...................................................... 15
                i.    *No Refusal* ........................................... 16
                ii.    *Substantial Compliance* ........................... 18
                iii.    *Waiver* ................................................. 19
                iv.    *Prejudice* .............................................. 20
                v.    *Deviation From Iowa's Standard Policy* ....... 24
            c.    *Examination Under Oath -- Conclusion* ............ 26
        2.    *Mapleton's Claim For Bad Faith* ............................. 27
            a.    *No "Denial"* ............................................ 28
            b.    *Reasonable Basis* ...................................... 29
            c.    *Knowledge* ............................................... 30
         3.    *Punitive Damages* ............................................. 31
    C.    *Conclusion* ................................................................ 31

II.    *Mapleton's Motion to Compel Appraisal* ..................................... 31
       A.    *Introduction* ............................................................ 31
       B.    *Discussion* ............................................................. 32
             1.    *Meaning of the Appraisal Provision* ........................ 32
             2.    *The Alleged "Causation and/or Coverage Dispute" Exception* ........................................................ 33
             3.    *Should I Compel Appraisal?* ................................ 38

*CONCLUSION* ...................................................................... 40

## INTRODUCTION

This case is before me on two motions: (1) plaintiff's motion (Doc. No. 14) to compel appraisal and (2) defendant's motion (Doc. No. 15) for summary judgment. I heard oral argument on both motions on June 24, 2013. Shannon Henson appeared for plaintiff Mapleton Processing, Inc. ("Mapleton"). David May and Caroline Bettis appeared for defendant Society Insurance Company ("Society"). Both motions are fully submitted.

## PROCEDURAL HISTORY

Mapleton commenced this action by filing a Petition at Law and Jury Demand (Doc. No. 3) in the Iowa District Court for Monona County on August 17, 2012. Mapleton alleges that it owns property in Mapleton, Iowa, that was damaged by a tornado on April 9, 2011. Mapleton further alleges that the property was covered by an insurance policy issued by Society and that Society has refused to pay the amount Mapleton contends is due and owing under the Policy. Article I of the petition includes claims for breach of contract, unjust enrichment and recovery on a reasonable expectations theory. Article II asserts a claim for insurance bad faith while Article III is a request for punitive damages.

Society filed a timely notice of removal (Doc. No. 2) to this court on September 10, 2012. Society alleged that removal was appropriate in accordance with this court's

diversity jurisdiction, as described in 28 U.S.C. § 1332, because Mapleton is a citizen of Iowa, Society is a citizen of Wisconsin and the amount in controversy exceeds $75,000, exclusive of interest and costs. *See* Doc. No. 2 at ¶ 2. Mapleton has not challenged the removal of this action and has not argued that this court lacks subject matter jurisdiction.

Society filed its initial answer (Doc. No. 5) on September 14, 2012, and an amended answer (Doc. No. 6) on September 27, 2012. In its affirmative defenses, Society contends (a) that it has not denied Mapleton's claim, (b) that Mapleton failed to comply with a provision of the policy that allows Society to conduct an examination under oath and (c) that this failure requires dismissal of this action because the policy provides that legal action cannot be commenced unless there has been full compliance with the terms of the policy. *See* Doc. No. 6 at 6-7.

The parties subsequently consented to trial, disposition and judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). The case was assigned to me by an order (Doc. No. 11) entered December 4, 2012.

Mapleton filed its motion to compel appraisal on May 2, 2013. Society filed a resistance on May 16, 2013, and Mapleton filed a reply on May 28, 2013. Meanwhile, Society filed its motion for summary judgment on May 10, 2013. Mapleton filed its resistance on June 3, 2013, and Society filed its reply on June 19, 2013.

## FACTUAL OVERVIEW

**The Claim.** On April 9, 2011, a tornado caused damage to a structure owned by Mapleton. Mapleton operated a meat processing plant and locker facility on the premises. The premises were insured by a Businessowners Policy ("Policy") issued by Society. The Policy was in effect from October 3, 2010, to October 3, 2011. After the tornado, Mapleton contacted Society to report the damage.

Society originally assigned the claim to adjuster Chris Stubbe. On April 13, 2011, independent adjuster Dan Henson inspected the building. Henson developed

some concerns about the structural integrity of the building. Mapleton's owner, Richard Nichols, discussed his own structural and foundational concerns with Henson.

On April 15, 2011, Society reassigned the adjustment of Mapleton's claim to Jim Sutter. Sutter inspected the premises on April 19, 2011. Nichols was present, along with a contractor who was a business acquaintance of Nichols'. Nichols mentioned cracking in the foundation. Sutter also observed cracking but did not know if the cracking was caused by the tornado or was preexisting. Sutter noticed that some of the cracks had been painted in, meaning they had existed prior to the tornado.

Sutter determined that an engineering inspection was necessary. The contractor who was at the inspection with Nichols recommended that Doug Rose of Bacon Creek Design conduct the inspection. Nichols agreed with the recommendation. Sutter called Rose, who indicated that he could visit the site that afternoon to conduct an inspection. Sutter advised Rose that he could bill Society for his services.

Rose conducted his inspection on the afternoon of April 19, 2011. Sutter, Nichols and the contractor were again present. After the inspection, Rose prepared a report to summarize his findings. He described damage to the roof and other exterior features of the building. As for the interior, he stated: "Cracks in the interior masonry bearing wall are the only structural damages that were visible at the time of this inspection. This wall has numerous vertical and horizontal cracks on each face." He recommended tuck pointing as the proper method of repair, at an estimated cost of $2,960.00.

Meanwhile, Sutter prepared a line item estimate of repairs. He states that the estimate was based on Rose's opinions and calculations and that Rose reviewed and agreed with the estimate. While Sutter had some doubt as to whether the tornado caused all of the cracks at issue, his estimate included Rose's proposed repair for those cracks. As a result of Sutter's estimate, Society determined that the actual cash value of the loss was $22,336.77. After subtracting the policy deductible, the payment to Mapleton would be $21,836.77.

According to Sutter, when he advised Nichols of this determination Nichols stated the amount was less than he anticipated and that he would settle the claim for $30,000. In his affidavit, Nichols denies that he offered to settle the claim for $30,000 but admits that he "offered to settle for $50,000 to $60,000." Whatever the amount, Nichols later rescinded his offer. He states that he did so after obtaining opinions that the damages caused by the tornado were far greater.

On May 5, 2011, Society issued a check to Mapleton (and its bank) in the amount of $21,836.77. Mapleton cashed that check but also hired a public adjuster, Jim Pierce, to assist with its claim. Pierce arranged for Forensic Building Science, Inc. ("FBS") to conduct an inspection. Tom Irmiter of IBS inspected the building in August 2011 and prepared a report dated September 19, 2011. The report describes significant items of damage Irmiter attributed to the tornado. For example, it states that the existing cracks were worsened by the storm, new cracking occurred as a result of the storm and that this damage was consistent with effects of winds in excess of 140 miles per hour. While the report did not include a specific dollar value for the necessary repairs, it included a statement that the repairs "may exceed the value of the building."

Society then scheduled another inspection by Bacon Creek Design. On November 15, 2011, Sutter and Pierce, along with Rose and Eldon Schroder (also an engineer with Bacon Creek Design), conducted that inspection. During the inspection, Sutter and Pierce discussed the Irmiter report and Pierce stated that he did not agree with everything contained in that report.

This was not Schroder's first inspection of the property. He conducted an inspection in 1993 to review damage caused by a water leak when the property was under different ownership. As such, according to Society, he was in a unique position to advise it as to which of the structure's conditions pre-dated the tornado.

Schroder submitted a letter and report to Society in December 2011. He stated that much of the damage Mapleton claimed to be caused by the tornado was not. He described the damage that, in his opinion, *was* storm-related and stated that the other

items for which Mapleton sought payment "resulted from inadequate construction of walls required to resist lateral soil pressure, a 1993 water leak, deferred maintenance and frugality on the original construction." He also stated: "Age, wear and tear, or weather inevitably caused deterioration that ought not to be called storm damage. This windstorm has been seized as the providential opportunity accompanied by a deep pocket containing funds for repairs or judicious upgrading." He concluded that the damage caused by the tornado was "less than $5,000." In other words, Schroder advised Society that it had *overpaid* Mapleton on its claim.

Pierce prepared his own report based on the November 2011 inspection. His report is largely consistent with Irmiter's report and includes a finding that the actual cash value of the damage totals $173,609.85. In his supporting affidavit, Pierce notes that his disagreement with Society's adjustment of the claim involves both the scope of the damage and Society's pricing. In other words, even with regard to repairs that Society acknowledges to be storm-related, Pierce believes Society has understated the repair costs. Based on Pierce's report, Mapleton submitted a sworn proof of loss, dated January 18, 2012, with the amount listed as "$173,109.85+." Society disputes this amount.

*The Policy.* The parties rely on several provisions of the Policy in support of their respective arguments:

### Duties In The Event Of Loss Or Damage

b.  We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

## Legal Action Against Us

No one may bring a legal action against us under this insurance unless:

a.      There has been full compliance with all of the terms of this insurance; and

b.      The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

## Concealment, Misrepresentation or Fraud

This policy is void in any case of fraud by you as it relates to this policy at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1.      This policy;
2.      The Covered Property;
3.      Your interest in the Covered Property; or
4.      A claim under this policy.

## Appraisal.

In case the insured and this Company shall fail to agree as to the actual cash value or the amount of loss, then on the written demand of either, each shall select a competent and disinterested appraiser and notify the other of the appraiser selected within twenty days of such demand. The appraisers shall first select a competent and disinterested umpire; and upon failing for fifteen days to agree upon such umpire, then, on request of the insured or this Company, such umpire shall be selected by a judge of a court of record in the state in which the property covered is located. The appraisers shall then appraise the loss, stating separately actual cash value and loss to each item; and, failing to agree, shall submit their differences, only, to the umpire. An award in writing, so itemized, of any two when filed with this Company shall determine the amount of actual cash value and loss. Each appraiser shall be paid

by the party selecting him and the expenses of appraisal and umpire shall be paid by the parties equally.[1]

*Request for Appraisal.* On December 14, 2011, Pierce submitted a request for appraisal on Mapleton's behalf in reliance on the Policy's appraisal provision. Society responded through its counsel on December 21, 2011. According to Society, the request was premature because, as of that date, no sworn proof of loss had been submitted and other documentation Society had requested had not yet been provided.

Mapleton renewed its request for appraisal in May 2012. It made additional requests in January and March of 2013, months after it filed this lawsuit. Society declined those requests and contends that the appraisal procedure is inappropriate when disputes exist as to causation and/or coverage.

*Request for Examination Under Oath.* In February 2012, Society requested that Nichols submit to an examination under oath ("EUO") as provided in the Policy. According to Society, it sought to ask Nichols about various topics, including the Bacon Creek Design reports from 1993 and 2011 and Nichols' prior offer to settle the claim (which, according to Society, was in the amount of $30,000). Nichols agreed to submit to the EUO and it was scheduled for June 22, 2012. However, Society postponed the EUO because its counsel became ill on June 21, 2012. The parties then selected August 1, 2012, as the new date for the EUO.

Mapleton retained new counsel (its counsel of record in this case) on July 31, 2012. That afternoon, the new attorney left a voicemail message for Society's counsel advising that her firm had been retained to represent Mapleton and stating that the EUO would have to be rescheduled. She also sent a letter to Society's counsel by fax and mail confirming her voicemail message and asking that he contact her "so that we can reschedule this for a later date."

---

[1] The Policy actually has two separate appraisal provisions, which vary slightly in ways that are not significant to any pending issues. The provision quoted here is the one Mapleton references in its motion to compel appraisal.

According to Society, its counsel did not learn of the cancellation until the morning of August 1, 2012, just before the EUO was to take place. Society's counsel called Mapleton's new counsel to discuss the cancellation and, apparently, to express unhappiness about the resulting cost and inconvenience. During this conversation, he advised her that he had surgery scheduled for later that month.

After this conversation, Mapleton's counsel sent a letter to Society's counsel dated August 1, 2012. She commented on his "aggravation" and then stated that Nichols "has not refused to appear for an EUO nor does he intend to refuse to appear for an EUO." She again requested new dates for the EUO.

Society's counsel responded with a letter dated August 7, 2012. The letter addressed the reasons for Society's counsel's annoyance about the last-minute cancellation and stated that Society did not intend any waiver or estoppel of any of its rights. The letter did not provide proposed new dates for the EUO.

Mapleton filed this action ten days later, on August 17, 2012. Apparently there were no additional communications between the parties or counsel prior to that date. However, three days after filing the lawsuit, Mapleton's counsel wrote to Society's counsel to indicate that the action had been filed and to request dates for the EUO.

## ANALYSIS

### I. Society's Motion for Summary Judgment

#### A. Summary Judgment Standards

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id*. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id*.

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. Essentially, a genuine issue of material fact determination, and thus the availability of summary judgment, is a determination of "whether a proper jury question [is] presented." *Id*. at 249. A proper jury question is present if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id*.

The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 910 (8th Cir. 2005). The nonmovant must show an alleged

issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).


### B.    Discussion

Society contends that Mapleton's entire lawsuit must be dismissed because it was filed before Nichols submitted to an EUO, as requested by Society pursuant to the Policy. In the alternative, Society argues that all of Mapleton's claims other than breach of contract fail as a matter of law.

In its resistance, Mapleton states that it no longer intends to pursue its claims for unjust enrichment or recovery on a reasonable expectations theory. As such, I will grant Society's motion for summary judgment with regard to Counts II and III of Article I of Mapleton's state court petition. With regard to its remaining claims, Mapleton (a) denies that the lack of a pre-action EUO requires dismissal of this case and (b) contends that genuine issues of material fact preclude entry of summary judgment on its claims for insurance bad faith and punitive damages.

### 1. *Lack of a Pre-Action Examination Under Oath*

It is undisputed that the Policy gives Society the right to demand and conduct an EUO. It is also undisputed that the Policy states no legal action may be filed under the Policy until there "has been full compliance with all of the terms of this insurance." Finally, it is undisputed that Society requested that Nichols submit to an EUO but that this action was filed before he did so.

Society contends that under Iowa law,[2] these undisputed facts mandate an award of summary judgment in its favor. It relies on the Iowa Supreme Court's decision in *Watson v. Nat'l Surety Corp.*, 468 N.W.2d 448 (Iowa 1991). Because *Watson* is pivotal, I will discuss it in detail below. Before doing so, however, I must consider my role in construing and applying Iowa law.

This is a diversity case presenting claims under Iowa law. My role "is to interpret state law, not to fashion it." *Orion Fin. Corp. of S.D. v. Am. Foods Grp., Inc.*, 281 F.3d 733, 738 (8th Cir. 2002). A federal court sitting in diversity "is not an appellate court of the State . . . and establishes no rules of law for that State." *Homolla v. Gluck*, 248 F.2d 731, 734 (8th Cir. 1957). Thus, "[w]hen determining the scope of [Iowa] law, [I am] bound by the decisions of the Supreme Court of [Iowa.]" *Kingman v. Dillard's, Inc.*, 643 F.3d 607, 615 (8th Cir. 2011). Only if the Iowa Supreme Court has not addressed an issue would I be free to predict how that Court *might* rule on that issue. *Id.* Here, Society contends that *Watson* constitutes binding precedent that, when applied to the facts of this case, mandates entry of summary judgment against Mapleton.

### a. *The Watson Decision.*

The plaintiffs in *Watson* owned a bowling alley that was destroyed by fire. *Id.* at 449. The premises were covered by a fire insurance policy issued by the defendant.

---

[2] The parties agree that Iowa law applies to the claims and issues in this case.

*Id.* One plaintiff gave a taped, unsworn interview to an insurance adjuster within 48 hours after the fire. *Id.* at 449-50. Several days later, both plaintiffs gave taped, unsworn interviews to another adjuster. *Id.* at 450. The plaintiffs then submitted a sworn proof of loss in the amount of $530,000. *Id.* Meanwhile, the insurer received an investigator's report indicating that the fire was "of incendiary origin." *Id.* And, in fact, both plaintiffs were charged with arson. *Id.*

The insurer presented both plaintiffs with written requests to question them under oath. *Id.* Like the Policy in this case, the policy in *Watson* included an EUO provision stating that the insureds must:

> [i]f requested, permit us to question you under oath at such times as may be reasonably required about any matter relating to this insurance or your claim, including your books and records. In such event, your answers must be signed.

*Id.* at 449 n.1. Moreover, according to the Court:

> The fire insurance policy in this case provides that an insured may not bring an action against the insurer unless "[t]here has been full compliance with all the terms of this Coverage Part...."

*Id.* at 450.

The *Watson* plaintiffs refused to answer the questions under oath, contending that their prior taped-but-unsworn interviews satisfied their obligations under the fire insurance policy. *Id.* When the insurer renewed its request, the plaintiffs submitted affidavits stating that they had reviewed the transcripts of their prior interviews and that "each and every response . . . is true and correct as I verily believe." *Id.* The insurer contended that this after-the-fact effort to convert unsworn answers into sworn ones did not comply with the policy. As such, and while it paid benefits to other named insureds who suffered losses due to the fire, the insurer denied the plaintiffs' claim in its entirety on grounds of noncompliance with policy obligations. *Id.*

Plaintiffs then filed a declaratory judgment action seeking a determination of their rights under the policy. *Id.* at 449. The trial court ruled in the insurer's favor,

finding that the plaintiffs' refusal to submit to questioning under oath was a material breach of a condition of coverage contained in the policy and voided any coverage to which they otherwise would have been entitled. *Id.* On appeal, plaintiffs argued that their actions constituted substantial compliance with the policy such that they should not be deprived of coverage. They also argued that offers they made to submit to an EUO after filing suit cured any alleged noncompliance with their obligations under the policy. *Id.* at 450, 452.

The Iowa Supreme Court affirmed the trial court's judgment against the plaintiffs. *Id.* at 452. The Court first held that compliance with the policy's EUO provision was a condition precedent of plaintiffs' recovery under the policy. *Id.* at 451. It then addressed the issue of substantial compliance and held that the plaintiffs' actions did not suffice. *Id.* at 452. With regard to plaintiffs' submission of affidavits ratifying the veracity of their prior, unsworn statements, the Court stated:

> [W]e believe that insureds' later attempt does not raise the status of the earlier interviews to questions under oath. Several reasons support our conclusion. The earlier interviews remain as unsworn statements at the time they were given. Also, there is no indication that the insurer intended these preliminary interviews to be a substitute for questions under oath. Finally, the language of the policy condition states that insureds may be questioned "at such times as may be reasonably required." The plural word "times" indicates that the insurer was not restricted to a single interview. All of these reasons indicate that an earlier unsworn interview, even though later verified, cannot constitute substantial compliance with the insurer's request for questioning under oath.

*Id.*

Finally, the Court considered the plaintiffs' argument that their post-filing offers to submit to examinations under oath cured any prior noncompliance. *Id.* Citing cases from other jurisdictions, the Court held that such belated offers did not solve the problem:

> The conclusions reached by these courts are reasonable. In order to determine whether to pay or deny an insured's claim, the insurer needs

14

the evidence at the time of the investigation when facts are more easily recalled and before crucial evidence is destroyed or becomes otherwise unavailable.

*Id.* As such, the Court held that the trial court correctly denied "plaintiffs' claims for recovery of fire losses under the insurance policy." *Id.*

### b.     Does Watson Entitle Society To Summary Judgment?

Under Iowa law, the party claiming entitlement to coverage under the policy must prove compliance with its terms. *Am. Guar. & Liab. Ins. Co. v. Chandler Mfg. Co.,* 467 N.W.2d 226, 228 (Iowa 1991); *Bruns v. Hartford Accident & Indem. Co.,* 407 N.W.2d 576, 579 (Iowa 1987); *Henschel v. Hawkeye-Security Ins. Co.,* 178 N.W.2d 409, 415 (Iowa 1970); *Henderson v. Hawkeye-Security Co.,* 106 N.W.2d 86, 91 (Iowa 1960). The party claiming coverage may meet this burden of proof by showing: (1) substantial compliance with the condition precedent; (2) the failure to comply was excused or waived; or (3) the failure to comply was not prejudicial to the insurer. *Am. Guar.,* 467 N.W.2d at 228; *Henderson,* 106 N.W.2d at 92.

*Watson* clearly establishes that an insured's compliance with a policy's EUO provision is a condition precedent to coverage. Mapleton acknowledges that there have been no subsequent decisions or legal developments that impact *Watson's* status as controlling Iowa law.[3] However, Mapleton contends *Watson* does not compel the entry of summary judgment for Society because:

a.      Nichols did not refuse to submit to an EUO and, therefore, did not fail to comply with the Policy's EUO provision.

---

[3] Only one reported Iowa case has cited *Watson* since it was decided 22 years ago. *See Brown v. Danish Mut. Ins. Ass'n,* 550 N.W.2d 171 (Iowa Ct. App. 1996). In *Brown,* the Iowa Court of Appeals applied *Watson* to affirm entry of summary judgment against an insured on his claim under a theft insurance policy. *Id.* at 173. Among other things, the court rejected the argument that *Watson's* holding concerning an insured's failure to submit to an EUO applies only to fire insurance policies. *Id.* at 174. The court also rejected as immaterial various factual distinctions the plaintiff advanced in attempting to distinguish *Watson. Id.* at 174-75.

b.      Mapleton substantially complied with the terms of the Policy.

c.      Society waived its right to an EUO.

d.      Society was not prejudiced by Mapleton's alleged noncompliance.

e.      The "Legal Action Against Us" provision in the Policy is not enforceable because it does not comply with Iowa law.

I will address each argument separately.

### i.      No Refusal

Mapleton seeks to distinguish *Watson* by noting that the insured in that case (and, also, the insured in *Brown)* expressly refused to submit to an EUO despite the insurer's request.  By contrast, Mapleton notes that while it abruptly canceled the EUO of Nichols that had been scheduled for August 1, 2012, it repeatedly advised Society that it was willing to reschedule that EUO and even requested proposed new dates for the EUO.  This lack of an express refusal, according to Mapleton, means there was no failure to comply with the Policy's EUO requirement.  This attempt to distinguish *Watson* is unavailing.

While Mapleton said all the right things in professing its willingness to produce Nichols for an EUO, it then made the choice to file this lawsuit before the EUO occurred.  There is no doubt that this choice was purely voluntary.  Mapleton was not under pressure to pursue this action when it did (August 17, 2012) due to any looming contractual deadlines or statute of limitations concerns.  Indeed, under the Policy's "Legal Action" clause, Mapleton could have waited almost eight more months before filing suit.[4]  Mapleton does not argue that it lacked sufficient time to schedule and complete the EUO before commencing this action.

---

[4] The Policy required any legal action to be filed "within 2 years after the date on which the direct physical loss or damage occurred."  Mapleton had until April 9, 2013, to commence this action.

Mapleton's explanation for filing suit when it did was that too much time had passed since the tornado and Society's counsel did not promptly respond to requests for new dates for the EUO. These alleged factors do not distinguish this case from *Watson*. Indeed, both come dangerously close to being silly. Mapleton made the choice to change counsel on July 31, 2012, and to cancel the EUO that was scheduled to occur the next day. While Mapleton certainly had the right to hire a new lawyer, that decision caused delay. The fact that the EUO had not been rescheduled a mere 17 days later hardly justified Mapleton's voluntary decision to file suit before complying with the Policy.

Mapleton's decision to file suit when it did is even less justifiable in light of its counsel's knowledge of Society's counsel's unavailability. As noted above, on August 1, 2012, Society's counsel advised Mapleton's new counsel that he would be undergoing surgery later in the month. As such, it could hardly have been surprising that the EUO, having been unilaterally canceled by Mapleton, had not yet been rescheduled as of August 17, 2012.

It is easy to imagine circumstances that would compel an insured to file suit before submitting to a requested EUO. Here, for example, if Society would have repeatedly ignored requests to reschedule the EUO in the months after August 2012 and Mapleton's contractual deadline for filing suit was approaching, Mapleton ultimately would have had no choice but to commence this action to protect its rights. Under those facts, a jury could easily find that Mapleton's obligation to comply with the EUO requirement was either waived or excused.

This case does not present anything remotely close to those facts. Mapleton knew Society wanted Nichols to submit to an EUO. Having canceled the scheduled EUO at the last minute, Mapleton also knew that Society's counsel was unavailable during much of August. Mapleton was under no time pressure to file this case. Nonetheless, and while professing its willingness to produce Nichols for an EUO, Mapleton made the voluntary decision to file its lawsuit before the EUO occurred. Of

course, this made it impossible for the EUO to occur before the action was commenced. While Mapleton may not have expressly refused to produce Nichols for a pre-action EUO, its conduct was the functional equivalent of a refusal.

As such, I find that the lack of an express refusal to submit to an EUO does not distinguish this case from *Watson*. In both cases, the insurer had a contractual right to conduct an EUO and requested the opportunity to do so. The policies in both cases prohibited the filing of any legal action prior to full compliance with all policy requirements. By canceling the EUO and filing this lawsuit before it could be rescheduled, Mapleton effectively refused Society's request for a pre-action EUO. The fact that it did not expressly refuse the request for an EUO does not put Mapleton in a better position than that of the plaintiffs in *Watson*.

### ii. Substantial Compliance

Mapleton next argues that even if it failed to fully comply with the Policy, it substantially complied such that the condition precedent to coverage has been satisfied. In particular, it notes (again) that Nichols never expressly refused to submit to an EUO and that Mapleton sought dates for the rescheduled EUO before and after filing this lawsuit. Indeed, it states: "Due to no fault on the part of Mapleton, no such dates were provided."

In support of its "substantial compliance" argument, Mapleton cites *Hoekstra v. Farm Bureau Mut. Ins. Co.,* 382 N.W.2d 100 (Iowa 1986). *Hoekstra* holds that substantial compliance, not strict compliance, is sufficient to satisfy a condition precedent to coverage. *Id.* at 107. The facts of *Hoekstra* are not particularly relevant here.[5] However, *Hoekstra* is cited in *Watson* for the proposition that an insured need

---

[5] *Hoekstra* involved a dispute over the insureds' compliance with the policy's "cooperation" clause by providing books and records "reasonably" requested by the insurer. *Id.* at 104-05. The insureds argued that many of their records were destroyed in the fire that caused the loss and that they provided all records that could be reasonably required. *Id.* at 105. The Iowa

only show substantial compliance with a condition precedent to coverage. *Watson*, 468 N.W.2d at 451. As I discussed earlier, the *Watson* Court then held that the plaintiffs failed to establish substantial compliance. *Id.* The Court reached this conclusion despite the plaintiffs' (a) sworn proof of loss, (b) unsworn statements later buttressed with sworn affidavits attesting to the veracity of those statements and (c) post-filing offers to submit to examinations under oath. The Court held that these actions did not constitute substantial compliance with the insurer's contractual right to conduct an EUO. *Id.* at 451-52.

Under Iowa law, the insured has the burden of proving substantial compliance with a condition precedent. *Id.* at 451 (citing *Hoekstra*, 382 N.W.2d at 107 and *Am. Guar.*, 467 N.W.2d at 228). I find *Watson* to be controlling in this issue and, therefore, that Mapleton has failed as a matter of law to meet this burden. Indeed, Mapleton is in no better position here than were the *Watson* plaintiffs. Under the terms of the Policy, Mapleton could not file suit until it had complied with all of the terms of the Policy. Its decision to cancel the scheduled EUO and file this action just 17 days later, before the EUO could be rescheduled, did not substantially comply with this condition precedent. Nor, under *Watson*, did its post-filing offers to produce Nichols for an EUO amount to substantial compliance.

### iii.    *Waiver*

Mapleton next argues that Society waived its contractual right to conduct an EUO before the filing of this lawsuit. This argument has no merit.

Under Iowa law, waiver is "the intentional relinquishment of a known right." *Huisman v. Miedema*, 644 N.W.2d 321, 324 (Iowa 2002) (quoting *State v. Hallum*, 606 N.W.2d 351, 354 (Iowa 2000)). Nothing in the record even remotely suggests that Society intended to waive its right to have Nichols submit to an EUO before the filing

Supreme Court held that the trial court correctly employed a substantial compliance standard in its instructions to the jury.

of a lawsuit. Indeed, it is hard to imagine how Society could have been clearer about its desire to avail itself of that right.

Society expressly requested that Nichols submit to an EUO and the examination was scheduled, by agreement of the parties, on two different dates. The first scheduled EUO was canceled by Society due to illness. Mapleton did not argue that this cancellation constituted a waiver of any rights (in any event, that argument would have been without merit). Instead, Mapleton agreed to reschedule the EUO for August 1, 2012. It was Mapleton, not Society, that canceled the second scheduled EUO. Nothing in the record suggests, even remotely, that Society thereafter waived its right to conduct an EUO. Society's counsel made it clear, in his letter of August 7, 2012, that Society was reserving all of its rights under the Policy and intended no waiver or estoppel of any kind. He also explained why Society intended to have its experts present at the future (but ultimately never scheduled) EUO.

The record reflects no additional communications until after suit was filed, ten days later. Mapleton could not have reasonably (or, frankly, even possibly) concluded that Society had decided to waive its right to the EUO. If there could have been any doubt about that, it would have been resolved by Society's answer and amended answer, filed, respectively, on September 14, 2012, and September 27, 2012 (Doc. Nos. 5 and 6). Both documents set out affirmative defenses based on Nichols' failure to submit to a pre-action EUO and alleged, as a result, that "this action cannot be maintained."

No facts in this record could arguably support a finding that Society waived its right to an EUO. Mapleton's "waiver" argument fails as a matter of law.

### iv.    Prejudice

Mapleton further contends that summary judgment is inappropriate because its failure to comply with the Policy's condition precedent to coverage caused no prejudice to Society. This issue is a far closer call.

As noted above, an insured's violation of a condition precedent will deprive the insured of coverage only if that breach causes prejudice to the insurer. *Am. Guar.*, 467 N.W.2d at 228; *Henderson,* 106 N.W.2d at 92. Under Iowa law, such a violation is presumed to be prejudicial to the insurer. *Met-Coil Sys. Corp. v. Columbia Cas. Co.*, 524 N.W.2d 650, 658 (Iowa 1994); *Am. Guar.*, 467 N.W.2d at 228. However, the insured may rebut the presumption if it shows the lack of prejudice by satisfactory evidence. *Met-Coil,* 524 N.W.2d at 658; *Western Mut. Ins. Co. v. Baldwin*, 137 N.W.2d 918, 925 (Iowa 1965).

*Met-Coil* illustrates prejudice to an extreme extent. There, the insured did not comply with a "notice of suit" provision contained in various policies. 524 N.W.2d at 655-56. By the time the insured complied, and gave notice to its insurers, it had spent over $4 million in attorney fees and was facing a judgment of over $18 million. *Id.* at 658. The insurers were deprived of the opportunity to participate in, control or monitor the litigation, to investigate the claims before trial or to make strategic decisions such as attempting to settle the claims. *Id.* at 658-59. Not surprising, the Iowa Supreme Court held that the insured did not rebut the presumption of prejudice. *Id.* at 659.

*Watson,* while not addressing prejudice in any detail, did touch on the harm that can arise if the insured refuses to submit to an EUO until after suit is filed:

> In order to determine whether to pay or deny an insured's claim, the insurer needs the evidence at the time of the investigation when facts are more easily recalled and before crucial evidence is destroyed or becomes otherwise unavailable.

*Watson,* 468 N.W.2d at 452. In *Henderson*, the Court made similar observations concerning the notice-of-suit requirement:

> It is the only avenue by which unjust claims can be successfully denied or defended. Unless given notice within a reasonable time, evidence could be lost and key witnesses never discovered.

106 N.W.2d at 92. Clearly, then, the concept of "prejudice" relates to the insurer's ability to investigate the claim and control the defense of any third-party litigation against its insured.

In *Watson,* the dates of relevant events were as follows:

| | |
|---|---|
| Date of loss (fire): | September 15, 1988 |
| First request for EUO: | December 28, 1988 |
| Lawsuit filed: | Unknown (but apparently after June 13, 1989) |

*Id.* at 449-50. Thus, the insurance company sought to examine the plaintiffs under oath about three months after the loss and the plaintiffs' first offer to submit to such examinations occurred sometime after they filed suit, apparently a year (at least) after the loss. Due to the plaintiffs' conduct, a long period of time passed between the time the examinations under oath should have occurred and the time the plaintiffs finally offered to submit to them.

In this case, the corresponding dates are:

| | |
|---|---|
| Date of loss (tornado): | April 9, 2011 |
| First request for EUO: | February 1, 2012 |
| Lawsuit filed: | August 17, 2012 |

This chronology differs sharply from that in *Watson.* Society did not even request an EUO until almost ten months after the loss. Due to various issues, including issues caused by Society's counsel's schedule, it was not scheduled until June 22, 2012. It then had to be cancelled (the first time) due to no fault of Mapleton's. It was later canceled again, this time by Mapleton, but Mapleton immediately attempted to reschedule it.

While Mapleton then inexplicably filed suit before the EUO could take place, it almost immediately repeated its request that Society reschedule the EUO. Indeed, Mapleton made this request on August 20, 2012, just three days after filing this action. As such, if Society had any interest in conducting the EUO, the EUO could have been

completed in late August or early September of 2012, despite Mapleton's premature filing of the lawsuit.

Mapleton's puzzling decision to file the lawsuit did not need to have any impact on the scheduling of the EUO. Was it a violation of the Policy's condition precedent? Of course. But as noted above, such a violation results in the forfeiture of coverage only if it causes prejudice to the insurer. And while prejudice is presumed, the insured may rebut this presumption. In the context of Society's motion for summary judgment, this means I must determine whether "there is sufficient evidence [on the issue of prejudice] favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

I find that the answer is "yes." Stated differently, I am unable to conclude, as a matter of law, that Mapleton cannot rebut the presumption of prejudice. The summary judgment record contains no evidence of any prejudice or harm to Society due to Mapleton's (unfortunate) decision to file suit when it did. Indeed, while Mapleton argued about the lack of prejudice in its resistance brief, Society did not respond to that argument in its reply. Frankly, I have no idea how Society could have possibly suffered prejudice as a result of Mapleton's premature commencement of this action.

Unlike the insurer in *Watson,* Society chose to wait nearly ten months before requesting an EUO. The concerns expressed in *Watson* about faded memories and the destruction of evidence arise in this case, if at all, because of this initial delay. Moreover, after requesting an EUO, Society did not demand that it occur immediately and indicate that time was of the essence. Indeed, due to various scheduling issues, Society proposed in May 2012 that the EUO take place on June 22, 2012. Doc. No. 15-6 at 29 (Def. App. 342). It was scheduled for that date but canceled by Society, not Mapleton. Again, Society did not press for immediate rescheduling and contend that it was suffering prejudice due to the passage of time. Instead, it agreed to a new date of August 1, 2012.

Society does not argue that it suffered any harm or prejudice because of the passage of time prior to August 1, 2012. Thus, Mapleton's subsequent cancellation of the August 1 event, when combined with its immediate and repeated attempts to reschedule it, hardly compels me to find, as a matter of law, that Society suffered prejudice by the additional delay after that date.

The fact that Mapleton then chose to file this lawsuit on August 17, 2012, does not change the "prejudice" analysis. While the commencement of this action clearly violated the Policy, Society has not argued that proceeding with an EUO became legally, or even practically, impossible once the lawsuit was filed. In other words, Society could have gone forward with the EUO despite its annoyance over Mapleton's premature filing. Instead, it elected to seize on Mapleton's mistake, forego its right to an EUO, and seek dismissal of this case based on Mapleton's failure to comply with the Policy's condition precedent.

Under these circumstances, and particularly in light of Mapleton's effort to reschedule the EUO immediately before and after it filed this lawsuit, I find that reasonable jurors could return a verdict for Mapleton on the issue of whether Society suffered prejudice. As such, I must deny Society's motion for summary judgment to the extent it is based on Mapleton's failure to comply with a condition precedent of coverage. While Mapleton's noncompliance is obvious, the resulting prejudice to Society is not. The jury must decide whether Society suffered prejudice. If not, then Mapleton's premature filing of this action is not grounds for depriving it of coverage under the Policy.

### v. Deviation From Iowa's Standard Policy

Finally, Mapleton argues that the Policy's "Legal Action Against Us" provision is unenforceable because it is more restrictive than permitted by Iowa law. As noted earlier, that provision states, among other things, that "no one may bring a legal action against [Society] under this insurance unless . . . [t]here has been full compliance with

all of the terms of this insurance." Mapleton contends that this language improperly deviates from the "Standard Policy" set forth in Iowa Code § 515.109. In particular, Mapleton points out that the corresponding provision in the Standard Policy states that no legal action "shall be *sustainable* in any court of law or equity unless all the requirements of this policy shall have been complied with." *See* Iowa Code § 515.109 [emphasis added]. According to Mapleton, there is meaningful difference between stating that "no one may bring a legal action" and stating that no action "shall be sustainable."

Mapleton further argues that this difference renders Society's policy language invalid because it is "unlawful for any insurance company to issue any policy . . . other or different from the [Standard Policy]." *See* Iowa Code §§ 515.109, 515.110. While admitting that no Iowa case says so, Mapleton concludes: "[I]t seems clear that the Society policy is substantially more restrictive than the Iowa Standard Policy with respect to the insured's right to pursue legal recourse against the insure[r]."

Society responds by correctly noting that the language at issue here is virtually identical to the language addressed in *Watson*. In that case, the Iowa Supreme Court described the policy as proving "that an insured may not bring an action against the insurer unless '[t]here has been full compliance with all the terms of this Coverage Part." *Watson,* 468 N.W.2d at 450. At no time did the Court suggest that a restriction on the insured's right to "bring an action" was an unenforceable departure from the Standard Policy, which is identical to the current Standard Policy. Indeed, the Court's analysis and holding demonstrate – quite clearly – that it enforced the provision at issue.

Of course, it is certainly possible that the plaintiffs in *Watson* did not raise an issue concerning the difference between the verbs "bring" and "sustain." Nonetheless, the fact that the Iowa Supreme Court addressed and enforced language that is virtually identical to the language at issue here is instructive. So too is Mapleton's admission

that no Iowa case[6] supports its position.  I hold that Society's "Legal Action Against Us" provision does not materially, or unlawfully, depart from Iowa's Standard Policy. As such, I reject Mapleton's argument that the provision is unenforceable.

### c.  *Examination Under Oath -- Conclusion*

As explained above, I find that Society has met its burden as the summary judgment movant of establishing, as a matter of law:

a.  that Mapleton violated a condition precedent of coverage by filing this lawsuit before producing Nichols for an examination under oath;

b.  that Mapleton did not substantially comply with the condition precedent; and

c.  that Society did not waive the condition precedent.

I also reject Mapleton's argument that the Policy's condition precedent is unenforceable due to an alleged departure from Iowa's Standard Policy language.

However, I further find that Society has not met its burden of establishing, as a matter of law, that it suffered prejudice due to Mapleton's failure to comply with the condition precedent.  Based on the summary judgment record, Mapleton may be able to rebut the presumption of prejudice at trial.  As such, I cannot grant summary judgment in Society's favor based on Mapleton's failure to produce Nichols for an EUO before it filed this lawsuit.

At trial, I will instruct the jury that Mapleton failed to comply with a condition precedent of coverage and that this failure precludes any recovery under the Policy unless Mapleton proves, with satisfactory evidence, that Society suffered no prejudice. If the jury finds that Mapleton has made this showing, then it will consider Mapleton's

---

[6] Mapleton repeatedly relies on Minnesota case law in support of its arguments.  Minnesota clearly takes a different approach than Iowa in cases involving an insurer's right to conduct an examination under oath.  That's interesting, but irrelevant.  As noted earlier, I must apply Iowa law to this case, not Minnesota law.

claim for breach of contract. If the jury finds that Mapleton has not made this showing, then it will be instructed to return a defense verdict.

### 2. *Mapleton's Claim For Bad Faith*

Society contends that even if the EUO issue does not dispose of this lawsuit, Mapleton's claim for insurance bad faith must nonetheless be dismissed as a matter of law. Under Iowa law, to prevail on a bad faith claim the insured "must prove by substantial evidence (1) the absence of a reasonable basis for denying the claim, and (2) that the defendant knew or had reason to know that its denial was without reasonable basis." *Sampson v. Am. Standard Ins. Co.*, 582 N.W.2d 146, 149-50 (Iowa 1998) (citations omitted). The first element is objective while the second is subjective. *Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 473 (Iowa 2005).

With regard to the first element, a reasonable basis exists for denial of policy benefits if the insured's claim is fairly debatable either on a matter of fact or law. *Id.; see also Sampson*, 582 N.W.2d at 150. In *Bellville,* the Iowa Supreme Court explained the "fairly debatable" concept as follows:

> A claim is "fairly debatable" when it is open to dispute on any logical basis. . . . Stated another way, if reasonable minds can differ on the coverage-determining facts or law, then the claim is fairly debatable.

*Id.* [citations omitted]. The Court further stated:

> Whether a claim is fairly debatable can generally be decided as a matter of law by the court. . . . That is because "'[w]here an objectively reasonable basis for denial of a claim actually exists, the insurer cannot be held liable for bad faith as a matter of law.'" As one court has explained, "[c]ourts and juries do not weigh the conflicting evidence that was before the insurer; they decide whether evidence existed to justify denial of the claim."

*Id.* at 473-74 [citations omitted]. The fact that the insurer's position is ultimately found to lack merit is not sufficient, by itself, to establish the first element of a bad faith claim. *Thompson v. U.S. Fid. and Guar. Co.,* 559 N.W.2d 288, 292 (Iowa 1997);

*Cent. Life Ins. Co. v. Aetna Cas. & Sur. Co.*, 466 N.W.2d 257, 263 (Iowa 1991). An insurance company has the right to debate claims that are fairly debatable without being subject to a bad faith tort claim. *Gardner v. Hartford Ins. Accident & Indem. Co.*, 659 N.W.2d 198, 206 (Iowa 2003).

Here, Society argues (a) it did not deny Mapleton's claim, (b) there was not an absence of a reasonable basis to deny the claim and (c) there is no evidence that Society knew or had reason to know that the denial was without reasonable basis. I will touch on the first and third arguments only briefly, as the second argument easily entitles Society to summary judgment on Mapleton's bad faith claim.

### a.   No "Denial"

Society first contends that it cannot be liable for the bad faith denial of Mapleton's claim because it has not, in fact, denied that claim. Society notes that it issued a check to Mapleton in the amount of $21,836.77 and contends that the fact that it paid *something* means there can be no liability for bad faith.

This is not one of Society's finer arguments. Society cites no case actually holding that an insurer's payment of some amount means the insured cannot maintain a claim for insurance bad faith. Instead, it simply notes that a denial "typically involves the insured receiving no payment."

Moreover, Society's argument ignores the fact that Mapleton submitted a sworn proof of loss in which it claimed policy benefits in excess of $173,000. Society has not paid benefits in that amount. In fact, Society has made it clear that it disagrees that any further payment is due to Mapleton. As such, while Society may not have denied Mapleton's claim in its entirety, it has certainly denied a large portion of that claim.

If Society's argument was an accurate statement of the law, an insurer could insulate itself from liability for bad faith by issuing a *de minimus* payment on every claim. In the absence of any legal authority that such an outcome is mandated by Iowa

law, I hold that Society's payment of some amount to Mapleton does not entitle Society to summary judgment on the bad faith claim.

### b.    Reasonable Basis

Society's next argument is significantly better. It contends that there can be no liability for bad faith because, as a matter of law, Mapleton's claim is fairly debatable. Among other things, Society notes that it in adjusting Mapleton's claim, it has relied on the opinions and findings of experts and that one of those experts, Schroder, inspected the premises both before and after the tornado.

Mapleton does little more than argue that Society has acted in bad faith by retaining and relying on its own experts rather than agreeing to "what Mapleton contends is fair value of its loss." Mapleton asserts that if the jury finds the value of the loss to be closer to its number than to Society's, then the jury should also be allowed to determine whether Society had a reasonable basis to dispute Mapleton's number.

That is not how it works. Whether a claim is fairly debatable or not fairly debatable does not depend on the jury's ultimate resolution of the insured's claim. As noted above, "[c]ourts and juries do not weigh the conflicting evidence that was before the insurer; they decide whether evidence existed to justify denial of the claim." *Bellville*, 702 N.W.2d at 474 (quoting *State Farm Lloyds, Inc. v. Polasek*, 847 S.W.2d 279, 285 (Tex. Ct. App. 1992)). Here, there is no doubt that the record contains evidence justifying Society's decision to deny Mapleton's claim of entitlement to benefits beyond what Society has already paid. The premises have been inspected multiple times by numerous experts. Society has been provided with opinions that the actual value of the loss is either at, or below, the amount Society has paid. Society is not obligated to disregard its own expert in favor of Mapleton's. *See, e.g., Bellville*, 702 N.W.2d at 477; *Morgan v. Am. Family Mut. Ins. Co.*, 534 N.W.2d 92, 97 (Iowa 1995), *overruled on other grounds by Hamm v. Allied Mut. Ins. Co.*, 612 N.W.2d 775,

784 (Iowa 2000). Nor has Mapleton offered any evidence suggesting that Society's experts are unqualified or otherwise unreliable to such an extent that it could not be objectively reasonable to rely on their opinions.

There is a clearly factual dispute concerning the amount of the loss. Society believes much of the claimed damages pre-existed the tornado. Mapleton disagrees. Each side has evidence, including expert opinions, supporting its contention. That is the essence of this case. Mapleton's contention that the amount it claims is not even fairly debatable, and that Society thereby has acted in bad faith by disagreeing, is baseless. As a matter of law, the amount of Mapleton's claim is fairly debatable.

Finally, Mapleton argues that Society has acted in bad faith by denying its request for appraisal pursuant to the Policy. Mapleton cites no case holding that an insurer's failure to participate in appraisal, as opposed to its denial of a claim, can form the basis of a bad faith claim. In any event, and as I will discuss further, *infra*, the question of whether appraisal is appropriate in this situation is not simple. Even if Society's refusal to participate in appraisal could form the basis of a bad faith claim, Society's position was not unreasonable.

Society had a reasonable basis for disputing the amount of the claim and Mapleton's request for appraisal was fairly debatable. As such, Society is entitled to summary judgment on Mapleton's bad faith claim.

### c.   *Knowledge*

Because I have already found for Mapleton on the objective element of the bad faith claim, I need not devote significant attention to the other, subjective element. Society had a reasonable basis for its decisions, so it could not have known, or had reason to know, that it was acting without reasonable basis. Both prongs of Mapleton's bad faith claim fail as a matter of law.

### 3.    Punitive Damages

Under Iowa law, an independent tort – above and beyond a mere breach of contract – is required in order to sustain a claim for punitive damages. *See, e.g., White v. Nw. Bell Tel. Co.*, 514 N.W.2d 70, 78 (Iowa 1994).   Mapleton acknowledges this and states that its request for punitive damages is "incidental to its claim for bad faith against Society."   Because I am granting summary judgment for Society on Mapleton's bad faith claim, and because Mapleton has no other tort claims, its request for punitive damages fails as a matter of law.

### C.    Conclusion

Society's motion for summary judgment will be granted with regard to Counts II and III of Article I of the petition, and with regard to Articles II and III of the petition. With regard to Article I, Count I (breach of contract), the motion will be denied because there is a genuine issue of material fact as to whether Society suffered prejudice as a result of Mapleton's failure to comply with the Policy's condition precedent of an examination under oath before it filed this action.   This case will proceed to trial on the breach of contract claim only.

## II.    Mapleton's Motion to Compel Appraisal
### A.    Introduction

The Policy includes an appraisal procedure that either party may invoke if "the insured and [the insurer] shall fail to agree as to the actual cash value or the amount of loss."   Here, there is no dispute that Mapleton sought to invoke the appraisal procedure on multiple occasions and that Society, so far, has not agreed to participate.   Mapleton contends that the express terms of the Policy give it the right to compel appraisal and that Society has breached the Policy by refusing to proceed.   Society contends that appraisal is inappropriate, or at least premature, because this case involves causation issues and possible defenses to coverage.

To resolve Mapleton's motion, I must first construe the relevant Policy language. Next, I must consider Society's argument that an insurance contract's appraisal procedures are inapplicable when there are disputes as to causation or coverage. Finally, even if Mapleton had the contractual right to insist on appraisal, I must consider whether an order compelling appraisal is appropriate in the context of this pending civil action.

### B.    Discussion

#### 1.    Meaning of the Appraisal Provision

Under Iowa law, a court interprets an insurance policy by looking at the meaning of the words used in the policy and construes the policy to determine its legal effect. *Am. Family Life Ins. Co. v. Corrigan*, 697 N.W.2d 108, 111 (Iowa 2005).  If a policy is susceptible to more than one interpretation it is ambiguous, and the court must construe the meaning of the terms.  *First Newton Nat'l Bank v. Gen. Cas. Co.*, 426 N.W.2d 618, 628 (Iowa 1988).  The construction of ambiguous terms is in the light most favorable to the insured because insurance policies are contracts of adhesion.  *Id.*

Here, as noted above, the Policy states that either side may demand appraisal if "the insured and [the insurer] shall fail to agree as to the actual cash value or the amount of loss."  The Policy appears to contain no other conditions to invocation of the appraisal process.  Society does not contend otherwise.  Nor does Society deny that the parties failed to agree "as to the actual cash value or the amount of loss."  Indeed, it is clear that the parties hotly dispute this question.   Thus, the only factual condition specified in the Policy as being a predicate to appraisal clearly exists.

Nor is there any dispute about whether Mapleton complied with the Policy's procedural requirement for demanding appraisal.  The Policy states only that the party seeking appraisal must do so by "written demand."  There is no dispute that Mapleton made such a written demand on several occasions.  Again, Society does not argue

otherwise. Simply put, Society has no argument that the express terms of the Policy render appraisal inappropriate under the circumstances present in this case.

Nonetheless, Society argues that Mapleton is not entitled to invoke the appraisal process here because there are disputes concerning both causation and coverage. As for causation, it is clear that Mapleton attributes many items of damage to the tornado that Society considers to be exaggerated, pre-existing or otherwise not caused by that storm. Moreover, Society contends there are *bona fide* coverage questions present in this case arising from Society's belief that concealment or fraud may prevent a finding of coverage. Society cites several cases in arguing that appraisal is inappropriate when questions of causation and/or coverage exist.

As I will explain further below, I conclude that Society confuses the *scope and effect* of appraisal with the *availability* of appraisal. The Policy itself includes no exceptions or limitations to the effect that appraisal cannot be demanded if the parties disagree concerning causation or coverage. Nor has the Iowa Supreme Court held that appraisal provisions in insurance policies should be construed narrowly. By contrast, the Court has stated that contractual appraisal is a "favored" private procedure "because it serves as an inexpensive and speedy means of settling disputes." *Cent. Life Ins. Co.*, 466 N.W.2d at 260.

Under the express terms of the Policy that governs the contractual relationship between Mapleton and Society, Mapleton was entitled to demand appraisal because the parties "failed to agree as to the actual cash value or the amount of loss." Moreover, Mapleton complied with the Policy's procedural prerequisite by making a "written demand" for appraisal. The Policy language provided no basis for Society to reject that demand.

### 2. The Alleged "Causation and/or Coverage Dispute" Exception

As noted above, however, Society advocates a "causation and/or coverage" exception to the appraisal procedure. With one exception (or maybe two, as discussed

below), the cases it relies upon do not hold that the right to demand appraisal evaporates if causation or coverage is at issue. Instead, those cases address the scope and effect of the appraisers' work:

a. *Taylor v. Farm Bureau Mut. Ins. Co.,* 759 N.W.2d 2, No. 07-1580, 2008 WL 4525496 (Iowa Ct. App. Oct. 1, 2008) (table). *Taylor* actually illustrates the difference between the right to appraisal and the effect of appraisal. In that case, the Iowa Court of Appeals did *not* hold that there was no right to appraisal. Instead, it held that once the amount of loss was determined by appraisal, the insurer remained free to litigate "its liability for that loss." *Id.* at *6.

b. *Rogers v. State Farm Fire and Cas. Co.,* 984 So.2d 382 (Ala. 2007). In this case, the Alabama Supreme Court did not hold that appraisal was inappropriate, but only that the trial court erred by allowing the insurer to use the appraisal process to adjudicate causation issues. *Id.* at 392. The Court held: "[A]n appraiser's duty is limited to determining the 'amount of loss' — the monetary value of the property damage — and that appraisers are not vested with the authority to decide questions of coverage and liability." *Id.*

c. *Merrimack Mut. Fire Ins. Co. v. Batts,* 59 S.W.3d 142 (Tenn. Ct. App. 2001). Here, the court rejected the insured's argument that appraisal is akin to binding arbitration, thereby conclusively establishing the insurer's liability. *Id.* at 149-50. Instead, the court held, the appraisers' role was to determine the dollar amount of the loss, with issues such as coverage and liability to be resolved by the court. *Id.* at 152-53.

d. *Wells v. Am. States Preferred Ins. Co.*, 919 S.W.2d 679 (Tex. Ct. App. 1996). *Wells* is a useful, and oft-cited, case because the court undertook a lengthy analysis of cases from around the country in construing the scope and meaning of appraisal provisions. *Id.* at 684-85. The court ultimately held that appraisers appointed pursuant to such a provision are not authorized "to determine what caused or did not cause that loss," as that issue must be resolved by the court. *Id.* at 685. As such, the

34

court held that the appraisers exceeded their authority by making causation findings and that the trial court erred in granting summary judgment for the insurer based on those findings. *Id.* The court did not, however, hold that appraisal was improper or unavailable due to the presence of causation issues. Moreover, in a later case the Texas Supreme Court held that the insurance company could not "avoid appraisal at this point merely because there might be a causation question that exceeds the scope of appraisal." *State Farm Lloyds v. Johnson,* 290 S.W.3d 886, 893 (Tex. 2009) (affirming grant of motion for summary judgment to compel insurer to participate in the appraisal process).

e. *Auto-Owners Ins. Co. v. Kwaiser*, 476 N.W.2d 467 (Mich. Ct. App. 1991). In this case, the court held that the trial court erred in granting summary judgment for an insured, based on an appraisal, without first determining the extent of coverage. *Id.* at 470. The court noted that coverage issues are to be resolved by the court, not by appraisers. *Id.* at 469. Again, this case addresses the *effect* of an appraisal award, not the question of whether either party had the right to insist on appraisal.

The one case that clearly supports Society's position is *Jefferson Davis Cnty. Sch. Dist. v. RSUI Indem. Co.,* Civil Action No. 2:08-cv-190-KS-MTP, 2009 WL 367688 (S.D. Miss. Feb. 11, 2009). There, the court denied a motion to compel appraisal based on its holding that appraisal is inappropriate when there are coverage and causation questions. *Id.* at *2. The court did not analyze the difference between the scope of appraisal and the right to appraisal. Instead, it cited Mississippi cases for the proposition that the purpose of appraisal is to determine the money value of the property at issue. *Id.*

The case that arguably supports Society's position is *Yaldo v. Allstate Prop. and Cas. Ins. Co.*, 641 F. Supp. 2d 644 (E.D. Mich. 2009). *Yaldo* is a procedurally complex case in which the court devoted most of its ruling to the impact of an insured's failure to submit to an examination under oath and, ultimately, granted the insurer's

motion for summary judgment on that issue. *Id.* at 648-56. However, it did cite *Kwaiser* in rejecting the insured's request for entry of an order relating to appraisal proceedings. *Id.* at 646, 656. In referencing *Kwaiser,* the court stated that the defendant had cited it "for the proposition that appraisal proceedings are only to be utilized where there exists no issue as to coverage." *Id.* at 656. As noted above, I disagree with this characterization of *Kwaiser*. However, the *Yaldo* court appeared to accept the characterization. *Id.* at 656.

In short, there is a significant difference between arguing (a) appraisal is not appropriate when coverage and/or causation are in dispute and (b) when appraisal occurs, the appraisers are limited to valuation issues and may not address causation or coverage. Few cases have held that a dispute over causation or coverage eliminates the contractual right to appraisal. Most, as discussed above, hold only that the appraisers should stick to dollar amounts and stay away from making findings about causation or coverage.[7]

In the absence of controlling Iowa Supreme Court authority on this issue, I must predict how the Iowa Supreme Court would rule. *Kingman v. Dillard's, Inc.*, 643 F.3d 607, 615 (8th Cir. 2011). I hold that the most-logical outcome, and the outcome I predict would be adopted in Iowa, is that a dispute over coverage or causation does not eviscerate an insurance policy's appraisal clause. Instead, upon either party's written demand, a dispute over the amount of the loss is subject to the contractual appraisal process despite questions as to coverage or causation. Once appointed, the appraisers must determine the amount of the loss without regard to causation disputes or defenses

---

[7] Some courts have rejected even this limitation and have held that appraisers should also resolve causation issues. *See, e.g., CIGNA Ins. Co. v. Didimoi Property Holdings, N.V.*, 110 F. Supp. 2d 259, 269 (D. Del. 2000) (the appraisal process should include causation determinations). Mapleton does not advocate this approach. Indeed, it states: "Mapleton does not contend that causation or coverage disputes should be submitted to the appraisal panel for resolution." Doc. No. 18 at 2. It further states that coverage and causation issues must be determined by the court, while "amount of loss issues . . . are best determined by an appraisal panel." *Id.*

to coverage. Basically, this means valuing each item of loss claimed by the insured, in a sworn proof of loss, even if the insurer disputes causation of and/or coverage for some or all of those items. Questions as to whether the insurer is *liable* for all or part of the loss must be resolved by the court, not by the appraiser.

I reach this conclusion for several reasons. First, and most importantly, it is compelled by the express language of the Policy. The appraisal provision is clear and simple. Appraisal is required if (a) the parties "fail to agree as to the actual cash value or the amount of loss" and (b) one party makes a written demand for appraisal. The Policy does not state that the right to appraisal goes away if there is a dispute over coverage and causation. It is my task to interpret and construe the Policy as written, not to rewrite it for the benefit of either party.

Second, the Policy's appraisal provision comes directly from Iowa's Standard Policy which, as I discussed earlier, is set out in Iowa Code § 515.109. The fact that the Iowa Legislature has mandated the inclusion of this provision should, I believe, make courts less inclined to recognize exceptions.

Third, and as also noted earlier, the Iowa Supreme Court has spoken kindly of the contractual appraisal process, noting that it is a "favored" private procedure "because it serves as an inexpensive and speedy means of settling disputes." *Cent. Life Ins. Co.*, 466 N.W.2d at 260. As a federal court sitting in diversity and attempting to predict how the Iowa Supreme Court might someday rule on this issue, I cannot help but find it instructive that both the Iowa Legislature and the Iowa Supreme Court seem to be pro-appraisal.

Fourth, and finally, I simply do not accept the limited, and generally undeveloped, arguments for avoiding appraisal when coverage and/or causation issues are present. I completely agree that the courts, and not the appraisers, must resolve coverage defenses and causation disputes. But this does not mean there is no role for appraisal when those disputes arise. A well-constructed appraisal, containing appropriate line items, can resolve "dollar amount" issues while reserving liability

questions for the jury and/or the judge. And, as one court has noted, a flawed or unhelpful appraisal can simply be ignored during subsequent litigation. *State Farm Lloyds,* 290 S.W.3d at 895. Meanwhile, I see no justification for a rule that would allow either party to an insurance contract to nullify its appraisal provision simply by raising an issue of causation or coverage.

To conclude, I hold that the existence of coverage and/or causation disputes does not preclude either party to an insurance contract from enforcing its contractual right to appraisal. However, if appraisal is invoked, the appraisers' role is limited to valuing the alleged loss. Questions about coverage and causation must be resolved by the court.

### 3. *Should I Compel Appraisal?*

So far I have found that the Policy gave Mapleton the right to demand appraisal and that Society's arguments for rejecting appraisal are unavailing. Procedurally, however, I still must determine whether the relief Mapleton now seeks – an order compelling appraisal – is appropriate in the context of this pending civil lawsuit. For several reasons, I find that it is not.

First, Mapleton's petition in this case does not seek relief in the form of an order compelling appraisal. In Article I, Count I (the breach of contract claim that constitutes Mapleton's only remaining claim), Mapleton alleges that Society breached the Policy by "failing to fully pay the claims presented to it" and requests entry of a money judgment for the resulting, alleged damages. *See* Doc. No. 3 at 4. The petition does not seek a declaratory judgment on the appraisal issue. Nor does it request entry of an affirmative injunction compelling Society to participate in the appraisal process.

As such, Mapleton now seeks the practical equivalent of an order granting summary judgment in its favor on an *unplead* claim. While arguing that the Policy creates a right of appraisal, Mapleton does not address the question of why I should, or even *could,* compel appraisal in the middle of a pending lawsuit that does not involve a

request for such relief. A court can compel parties to comply with their discovery obligations. *See* Federal Rule of Civil Procedure 37. Appraisal, however, is a right created by contract, not a discovery procedure. I am far from convinced that it would be appropriate for me to enter a pre-trial order requiring specific performance under a contract when no such claim is pending.

Second, Mapleton's decision to file this lawsuit when it did defeated the underlying purpose of appraisal which is to resolve disputes *before* filing a formal lawsuit. *See, e.g., Cent. Life Ins. Co.,* 466 N.W.2d at 260 (appraisal "is a supplementary arrangement to arrive at a resolution of a dispute without a formal lawsuit"); *State Farm Lloyds,* 290 S.W.2d at 894 ("appraisal is intended to take place before suit is filed" and "is a condition precedent to suit").

Third, Mapleton did not move promptly to compel appraisal after it commenced this action. Instead, it waited more than eight months before finally filing its motion. By then, this case was well into the discovery phase. Pursuant to the parties' joint proposed scheduling order, which I approved on December 4, 2012, Mapleton's expert witness deadline had already expired and Society's deadline was fast-approaching (and has now expired).[8] Discovery is scheduled to close in two months. An order compelling appraisal at this stage of the case would substantially disrupt the parties' agreed schedule. While I have no idea how long the appraisal process would take, I am rather certain that the final outcome would affect decisions concerning expert witnesses and would be likely to lead to requests for additional discovery.

Mapleton could have avoided this problem. It could have included a claim in its petition seeking enforcement of its contractual right to appraisal and then moved promptly for summary disposition of that claim. When conferring with Society's counsel to prepare the proposed scheduling order and discovery plan, it could have

---

[8] Bizarrely, Mapleton complains in its motion that if I do not compel appraisal, "it will be forced to hire experts to testify at trial." Mapleton filed the motion a month after its expert-disclosure deadline expired.

raised the issue of compelled appraisal and requested entry of a scheduling order that would have accounted for the appraisal process. At minimum, it could have filed its motion to compel appraisal long before it did.

For all of these reasons, I will not compel appraisal in this case. Mapleton had a contractual right to demand appraisal, but I find that it waived that right by virtue of its decisions and actions (or inactions) in this case. A federal court has the inherent power "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Gurley v. FedEx Ground Package Systems, Inc.*, 869 F. Supp. 2d 999 (S.D. Iowa 2012) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). Compelling appraisal at this stage of the case, when a request for such relief is not even contemplated by the pleadings, would cause unnecessary delays and complexities. It certainly would not advance the actual purpose of appraisal, which is to resolve disputes privately before a lawsuit is filed. *Central Life Ins. Co.*, 466 N.W.2d at 260.

## CONCLUSION

Society's motion for summary judgment (Doc. No. 15) is **granted in part** and **denied in part**. It is granted with regard to Counts II and III of Article I of the state court petition. It is also granted with regard to Articles II and III. It is denied with regard to Count I of Article I – the breach of contract claim. This case will proceed to trial on that claim only.

Mapleton's motion to compel appraisal (Doc. No. 14) is **denied**.

**IT IS SO ORDERED.**

**DATED** this 10th day of July, 2013.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE